KRAVITCH, Senior Circuit Judge:
The Alabama Department of Corrections (“DOC”) prohibits inmates who test positive for the Human Immunodeficiency Virus (“HIV”) from participating in most of the educational, vocational, rehabilitative, religious, and recreational programs offered in state prisons. The appellant class, which consists of Alabama inmates who are HIV-positive (“HIV+” or “seropositive”), claims that excluding HIV+ prisoners from these programs violates the Rehabilitation Act of 1973 Section 504, 29 U.S.C. § 794 (“section 504” or “the Act”). A prior panel of this court, on an appeal by these appellants from a post-trial dismissal of their class action, remanded the section 504 claim “for additional findings and clarification by the district court.” Hams v. Thigpen, 941 F.2d 1495, 1528 (11th Cir.1991). On remand, the district court ruled in favor of DOC but failed to comply with the panel’s mandate. Accordingly, we again vacate the district court’s decision and remand.
I.
Upon entry into the Alabama prison system, each inmate is tested to determine whether he or she carries HIV. The state incarcerates men testing positive at the Limestone Correctional Facility (“Limestone”) and women testing positive at the Julia Tutwiler Prison for Women (“Tutwiler”). Each of these prisons houses HIV+ inmates in a separate unit. Seropositive prisoners not only live apart from non-infected inmates, but, in addition, “they have not been able to participate in most of the programs available to general population prisoners, while in other cases, the segregated programming provided to them is not comparable.” Harris, 941 F.2d at 1521-22.[1]
Carmen Harris filed suit in 1987 and later became the named plaintiff of the class of *1327 prisoners seeking declaratory and injunctive relief against DOC. The class claimed that Alabama’s HIV policy violated several constitutional provisions and section 504. The district court rejected each of the class’ claims. Harris v. Thigpen, 727 F.Supp. 1564 (M.D.Ala.1990). The prior panel affirmed the district court’s principal constitutional rulings,[2] but vacated its statutory ruling. Noting the absence of any “particularized inquiry” by the district court, the panel established the law of the case by remanding for “full findings of fact and conclusions of law as to each program and activity from which HIV-positive prisoners are being excluded, and a proper weighing of the dangers of transmission in each context.” 941 F.2d at 1527.
On remand, appellant Onishea was substituted as named plaintiff for Harris, who died during the litigation. The district court held a lengthy trial and, in an opinion discussing each program from which appellants are excluded, ruled that every program satisfied section 504. Onishea v. Herring, No. 87-V1109-N, slip op. (M.D.Ala. Dec. 29, 1995) (hereinafter “Op.”). Appellants filed a timely appeal.
II.
Appellants suggest that the district court’s opinion contains numerous errors of law and fact that call into question the court’s ultimate rejection of their section 504 claim. We discuss the essential statutory elements of a cause of action under the Act and then address the specific challenges to the district court’s decision.
A.
Section 504 states: “No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....” 29 U.S.C. § 794. Thus, appellants’ prima facie case of unlawful discrimination under the Act consists of four elements:
1) they are “handicapped” within the meaning of the Act; 2) they are “otherwise qualified”; 3) they are excluded from programs or activities solely because of the handicap; and 4) the programs or activities from which they are excluded are operated by an agency that receives federal financial assistance.
Harris, 941 F.2d at 1522. Only one of these elements is in dispute in this appeal — whether appellants are “otherwise qualified.” Id. at 1522-24 (holding that being HIV + is a “handicap” and noting that latter two requirements were undisputed).
Deciding whether a person with a contagious disease satisfies the “otherwise qualified” prong of section 504 necessarily begins with Sch. Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In Arline, the Supreme Court explained that a person is “otherwise qualified” if he “is able to meet all of a program’s requirements in spite of his handicap.” Id. at 287 n. 17, 107 S.Ct. at 1131 n. 17 (quoting Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)). If the individual has a contagious disease, however, the “otherwise qualified” element requires “the district court ... to conduct an individualized inquiry and make appropriate findings of fact” to determine whether integration would pose “significant health and safety risks.” Id. at 287, 107 S.Ct. at 1131. The significance of the risk turns on
reasonable medical judgments given the state of medical knowledge[ ] about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential, harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.
Id. at 288, 107 S.Ct. at 1131 (internal quotation omitted).[3] These factors must be bal *1328 anced; it is more easily justified, for example, for a federal grantee to exclude a person whose terminal illness is transmitted by casual contact than a person who poses little threat of infecting others or who carries a less serious disease.
Even if a plaintiff is not “otherwise qualified” for a program, “refusal to modify an existing program might become unreasonable and discriminatory” under the Act. Southeastern Community College v. Davis, 442 U.S. 397, 413, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979). That is, even though a plaintiff’s participation in a federally-funded program poses a significant risk to others, a plaintiff is nevertheless entitled to relief under the Act if reasonable accommodation will render the risk insignificant. Harris, 941 F.2d at 1525. A proposed accommodation, however, need not be implemented if it would impose an undue fiscal or administrative burden upon the recipient of federal funds or would require the grantee fundamentally to alter its program. Alexander v. Choate, 469 U.S. 287, 299-302, 105 S.Ct. 712, 719-21, 83 L.Ed.2d 661 (1985); Arline, 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17. The reasonable accommodation and undue burden inquiries overlap somewhat, and their precise contours are difficult to chart. See Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 144-48 (2d Cir.1995) (discussing relationship between inquiries). Federal grantees must take modest, but not unreasonable, affirmative steps to ensure that disabled persons have access to program benefits. See Davis, 442 U.S. at 407-08, 99 S.Ct. at 2367-68 (holding that grantee nursing program not required to provide student with personalized faculty assistance in communicating with patients or exemption from certain required courses as reasonable accommodations); Tatro v. State of Texas, 625 F.2d 557 (5th Cir.1980) (grantee school may be required to perform simple, brief medical procedure for student as a reasonable accommodation).
Applying these precepts to the facts of the case at bar, appellants are “otherwise qualified” if they are capable of participating in a prison program notwithstanding their disability and if their participation does not pose a significant risk to other inmates. We assess the significance of the risk by considering the potentially terminal nature of HIV infection, the likelihood that certain behavior will result in HIV transmission, and the frequency of such behavior in prison programs. If appellants are not “otherwise qualified” because they present a significant risk, reasonable accommodations may be available to render such risk insignificant. In prison, such accommodations will involve measures designed to prevent high-risk behavior. A prison grantee, however, is not obliged to undertake those accommodations that prove to be unduly burdensome from an administrative or financial standpoint.
B.
On remand, the district court found that appellants were not “otherwise qualified” for any of the prison programs from which they have been categorically excluded.[4] It also ruled that the accommodations proposed by appellants either were insufficient to minimize the risk of transmitting HIV or would pose an unreasonable burden on prison administration. Appellants argue that these conclusions were erroneous. Spe *1329 eifically, they claim that the district court: (1) allocated the burdens of persuasion at trial incorrectly; (2) improperly required appellants to disprove every possibility of HIV transmission in a program before finding the inmates “otherwise qualified”; (3) wrongly found that a plaintiff is not “otherwise qualified” if penological concerns justify discrimination; (4) refused to consider probative evidence that certain programs could be integrated safely; (5) misinterpreted the prior panel’s opinion by refusing to consider whether certain programs could be integrated at all; and (6) mistakenly concluded that any accommodation imposing additional costs upon DOC would be an undue financial burden.[5]
Appellants’ first argument is unpersuasive, but we conclude that their second and third claims are meritorious and require us to vacate the district court's decision. We discuss the remaining claims because they address errors that would likely occasion a third appeal and remand should they be repeated. Claims (1), (2), (3) and (5) are issues of law, which we review de novo, United States v. Olin Corp., 107 F.3d 1506, 1508 (11th Cir.1997); claim (4) challenges the district court’s exclusion of evidence, which we review for abuse of discretion, Judd v. Rodman, 105 F.3d 1339, 1341 (11th Cir.1997); and claim (6) is an issue of fact, which we review for clear error. Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1101 (3d Cir.1996).
1.
Appellants argue that circuit precedent places the burden on defendants to prove at trial that plaintiffs are not otherwise qualified or could not be made so with reasonable accommodation, but that the district court erroneously placed that burden on appellants. The district court concluded that the Rehabilitation Act requires plaintiffs to bear the burden of showing that they are qualified to participate in a program or that an accommodation is available that will make them qualified. Although we do not adopt the district court’s reasoning,[6] we conclude that it properly allocated the burdens in the present case.
In Treadwell v. Alexander, 707 F.2d 473, 475 (11th Cir.1983), we stated that “[o]nee a plaintiff shows an employer denied him employment because of physical condition, the burden of persuasion shifts to the federal employer to show that the criteria used are job related and that [the] plaintiff could not safely and efficiently perform the essentials *1330 of the job.” We also concluded that a “federal employer has the ultimate burden of persuasion in showing an inability to accommodate.” Id. at 478.[7] According to appellants, these remarks mean that appellants can carry their trial burden by demonstrating that they would be able to participate in prison programs if they were not HIV +. DOC then would have to prove that appellants’ seropositivity poses a significant risk that cannot be accommodated.
Appellants’ contention is inconsistent with both our controlling precedent and the prior panel’s remand. Recently, we stated unequivocally that a disabled plaintiff must prove that he or she is “otherwise qualified” by showing that he or she is capable of participation in a program, either with or without accommodation. Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1526 (11th Cir.1997). If accommodation is necessary, “[t]he plaintiff retains at all times the burden of persuading the jury that reasonable accommodations were available,” and if that burden is met, the defendant “has the burden of persuasion on whether an accommodation would impose an undue hardship.” Id.; see also Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir.1996) (same burdens). Likewise, in remanding the instant case, the prior panel held that “in order to obtain relief under section 504 appellants must establish that ... they are ‘otherwise qualified’ ____” Harris, 941 F.2d at 1522 (emphasis added).
Treadwell does not command a different result. In that case, this court suggested that a Rehabilitation Act plaintiff need only “com[e] forward with evidence to make at least a facial showing that his handicap can be accommodated” before the burden of persuasion shifts to the defendant. 707 F.2d at 478. The issue the court found dispositive, however, was that the defendant proffered evidence sufficient to show that the proposed accommodation — reassignment of some of the plaintiffs job duties to other workers— would pose an undue burden. Id. Consequently, the panel did not have to decide who bore the ultimate burden to show the availability of a reasonable accommodation.
Moreover, Treadwell’s dictum is distinguishable; the instant case challenges a federal grantee’s practice under section 504, whereas Treadwell involved a suit against a federal agency under section 501, 29 U.S.C. § 791(b). Unlike section 504, section 501 requires agencies to undertake affirmative action in favor of disabled people. See id. According to the Treadwell court, “[t]he necessity for providing reasonable accommodation is derived from” section 501’s affirmative action mandate. 707 F.2d at 477-78. In light of this observation and section 501’s purpose, which is to make the government a model employer, a proof regime different from section 504 is appropriate. Cf. Overton v. Reilly, 977 F.2d 1190, 1194 (7th Cir.1992) (citing Treadwell and suggesting that actions pursuant to sections 501 and 504 are identical, with the possible exception of the burden of persuasion on the issue of reasonable accommodation); Mantolete v. Bolger, 767 F.2d 1416, 1425 (9th Cir.1985) (Rafeedie, J., concurring) (noting differences between sections).
In sum, we hold that the district court correctly concluded that appellants bear the burden of persuading the finder of fact that they are “otherwise qualified” to participate in prison programs. This burden may be satisfied by showing either that their seropositivity poses no significant risk to others in the program or that reasonable accommodations are available to reduce the risk to an insignificant level. If appellants demonstrate by a preponderance of the evidence that available accommodations would make them “otherwise qualified,” then DOC would have to prove that the proposed accommodations pose an undue burden. We realize that “the evidence probative of the issue of whether an accommodation ... is reasonable will often be similar (or identical) to the evidence probative of the issue of whether a resulting hardship ... is undue,” Willis v. Conopco, 108 F.3d 282, 286 (11th Cir.1997), but note that appellants’ burden ordinarily operates at a higher level of generality. That is, appellants will have to show that the suggested accommodation will diminish sufficiently the *1331 risk of transmission and is reasonable ‘“in the run of cases....' " Id. at 286 n. 2 (quoting Barth v. Gelb, 2 F.3d 1180, 1187 (D.C.Cir.1993), cert. denied, 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994)). DOC would then be required to demonstrate that the proposed accommodation is unreasonable “in the context of the particular agency’s operations.” Id.
2.
People with contagious diseases are “otherwise qualified” if they meet all of the prerequisites for program participation and if their participation would not pose a significant danger. As stated supra, whether a person poses a significant threat depends on how the infection is transmitted, how long carriers are contagious, the potential harm to third parties, and the probability that the disease will be transmitted. Arline, 480 U.S. at 288, 107 S.Ct. at 1131. The central issue before the district court on remand concerned the fourth factor — the probability of transmission in specific programs. Appellants claim that the district court erroneously applied an unduly exacting standard in ruling that they could not be “otherwise qualified” for a program if there were any risk of transmission from HIV+ inmates’ participation. We agree that the district court demanded proof beyond that which the Act requires.
In Arline, the Supreme Court held that persons with infectious diseases are “otherwise qualified” unless, based upon four factors, then* contagion poses “significant health and safety risks ” to others, 480 U.S. at 287, 107 S.Ct. at 1130 (emphasis added). At the same time, however, a footnote suggested that one of these factors would have determinative weight in certain cases. The Court remarked: “A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk.” Id. at 287 n. 16, 107 S.Ct. at 1131 n. 16 (emphasis added). Thus, the Court seemed to distinguish between significant health risks and significant transmission risks and implied that a less than significant risk of transmission, no matter what the disease, alone could not suffice to justify a person’s exclusion from a federally-funded program.
The district court resolved the arguable tension between Arline’s significant health risk standard and its significant transmission risk footnote by declaring the latter to be a misstatement. It opined that “[a] strict reading of this could suggest that in analyzing whether reasonable accommodations would render one ‘otherwise qualified,’ the trial court should ignore the remaining Arline factors ... and consider only the probability of transmission.” Op. at 47. The district court then asked: “May this Court not weigh the catastrophic nature, duration, and severity against a lightweight probability of transmission?” Id. In the end, the district court concluded that a small possibility of transmission — but more than a remote theoretical possibility — would suffice to justify exclusion of HIV+ persons from programs receiving federal funds.
This circuit’s law is to the contrary. In Martinez v. School Bd. of Hillsborough County, Fla., 861 F.2d 1502 (11th Cir.1988), we held that the district court erred in upholding the exclusion of an HIV + child from special education classes. The school board argued that the child might transmit HIV to her classmates and teachers through saliva, tears, and excrement. The district court found that a “remote theoretical possibility” of transmission existed in an integrated program and ordered the student segregated. Id. at 1506. We rejected the district court’s analysis because it required too rigorous- a showing; the likelihood of transmission did not “rise to the ‘significant’ risk level that is required” under section 504. Id. In announcing this standard, we cited the Arline footnote that the district court in the present case declared irrelevant, and we remanded for “findings as to the overall risk of transmission. ...” Id. (emphasis added).
The district court in this ease distinguished Martinez, which involved transmission through means that were only theoretically possible (e.g., saliva and tears), from this case, which involves established transmission pathways (e.g., sex and needle sharing). Although correct, this observation does not vitiate Martinez’s announcement of a significant transmission risk test in eases involving HIV. Moreover, it ignores the fact that the prior *1332 panel hearing this case, citing both Martinez and the Arline footnote, endorsed the significant risk of transmission standard for this specific set of facts. See Harris, 941 F.2d at 1525 (“If, after reasonable accommodations, a significant risk of transmission of the infectious disease still exists, a plaintiff will not be considered ‘otherwise qualified’ ....”) (emphasis added).
The district court bolstered its decision to deviate from the significant risk standard by referring to non-circuit precedent, but gave the mistaken impression that courts have uniformly eschewed the significant transmission risk test in HIV cases. We are aware that the Fourth and Fifth Circuits have declared that HIV + medical workers who pose a less than significant risk of transmitting HIV may, consistent with section 504, be prohibited from performing invasive procedures. See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1266 (4th Cir.1995) (“Although there may presently be no documented case of surgeon-to-patient transmission, such transmission clearly is possible.”); Leckelt v. Bd. of Comm’rs, 909 F.2d 820, 829 (5th Cir.1990) (“Even though the probability that a health care worker will transmit HIV to a patient may be extremely low and can be further minimized through the use of universal precautions, there is no cure for HIV or AIDS at this time, and the potential harm of HIV infection is extremely high.”). Other courts, however, have followed closely the Supreme Court’s direction in Arline. See Chalk v. United States Dist. Court, 840 F.2d 701, 707-08 (9th Cir.1988) (“As authoritatively construed by the Supreme Court, section 504 allows the exclusion of an employee only if there is ‘a significant risk of communicating an infectious disease to others.’ ” (quoting Arline, 480 U.S. at 287 n. 16, 107 S.Ct. at 1131 n. 16)); New York State Ass’n for Retarded Children, Inc. v. Carey, 612 F.2d 644, 650 (2d Cir.1979) (applying significant transmission risk standard to hepatitis B, which has identical transmission pathways as HIV, ís easier to transmit, but is rarely fatal); Doe v. Dolton Elementary Sch. Dist. No. 148, 694 F.Supp. 440, 445-46 (N.D.Ill.1988) (holding that student was likely to prevail and was entitled to injunction where medical evidence showed no significant risk of HIV transmission in school).
Putting previous interpretations of Arline’s footnote aside, we are convinced that the Arline balancing test itself would require a significant risk of HIV transmission before sanctioning segregation. Epidemiologic evidence indicates that transmission of HIV requires intimate, rather than casual, human contact that involves the exchange of certain bodily fluids. Harris, 941 F.2d at 1503. At the same time, the record evidence in this case shows that HIV infection is incurable and potentially fatal.[8] Id. at 1502-03. Because the Arline factors point in different directions, then, determining the overall significance of the risk to third parties depends in large part on assessing the likelihood of behavior that would allow transmission of HIV. We realize that HIV infection frightens most people because of its life-threatening nature. By enacting section 504, however, Congress has directed its grantees to accept some risks and has prohibited them from unduly indulging their fears. See Abbott v. Bragdon, 107 F.3d 934, 946-48 (1st Cir.1997) (“[A] service provider like Dr. Bragdon is not entitled to demand absolute safety; he can rely upon the direct threat defense only in response to significant risks.”).
We therefore conclude that the district court erred in holding that a less than significant risk of transmitting HIV justifies appellants’ segregation from all programs. Further, a review of the court’s decision reveals that this legal conclusion permeated its program-specific findings. Throughout its opinion, the court ruled that appellants were not “otherwise qualified” without any attempt to quantify whether a sufficient risk of transmission existed to warrant categorical exclusion.[9] Because of the number of programs *1333 and activities at issue in this appeal, we will not enumerate here each instance in which the district court based its ruling on a less than significant risk of transmission. We offer, instead, three examples that demonstrate the court’s failure to quantify and appropriately balance the risks in each prison program.
The district court’s consideration of the first program is typical of its approach to many of the challenged activities. Religious programs are held in the Tutwiler chapel, with inmates supervised at all times by the chaplain or his assistants. Appellants argued at trial that the constant supervision would prevent any unsafe behavior, as evidenced by the fact that there had been no incident reports of risky activity during chapel services. Further, they claimed that any remaining safety risk could be rendered insignificant by requiring HIV + inmates to sit apart from general population prisoners. The court concluded that appellants’ evidence failed to prove them “otherwise qualified” because the lack of incident reports “does not prove that potentially high risk behavior (e.g., passing needles or syringes) never occurred, only that it has not been discovered.” Op. at 62.[10] In addition, the district court opined that appellants’ suggested accommodations did not aid their case; the separate sitting arrangements do not guarantee that high-risk behavior will not occur, the district court reasoned, because the civilian supervisors have no authority to discipline prisoners if they do not remain separate. Id. at 68.[11] These observations, however, rested on conjecture. First', the court assumed that inmates in the programs would possess needles or syringes. Second, it assumed that exchanges of such contraband occur but previously have been undetected. Third, it assumed that inmates would not obey the dictates of their civilian supervisors, even though civilian personnel are instructed to report disciplinary incidents to prison officials. Notably absent was any attempt to determine whether or how often inmates have secreted contraband into prison programs, whether or how often such contraband is able to be exchanged, and whether or how often such exchanges lead to high-risk activity. The district court created a scenario for transmission sufficient to satisfy an “any risk” standard by stringing its assumptions together, but failed to show that the scenario satisfies the governing significant transmission risk test.
Similarly, the district court held that DOC’s exclusion of HIV+ inmates from maintenance jobs at Tutwiler was justified. Although the prisoners are not supervised constantly, appellants argued that the prison job board only allows those inmates with appropriate behavioral histories to participate, thus minimizing the risk of high-risk behavior and, consequently, transmission. The district court held that appellants are not “otherwise qualified” because “[t]he risk of the job board^s making an erroneous decision always exists,” Op. at 211,[12] and because even careful selection of inmates who do not misbehave would not prevent potentially HlV-transmitting fights between seropositive participants and others who oppose integration. Id. at 217.[13] . Again, the result reached by the court reveals the difference between an “any risk” standard and a “significant risk” standard. The court merely speculated, about the job board’s fallibility without discussing the potential frequency of *1334 such errors[14] and assumed that inmate violence was likely to occur in the program. Moreover, although the district court conceded earlier in its opinion that the transmission risk from violence is low, it nevertheless found appellants ineligible to participate. The district court’s combination of these factors may identify a conceivable pathway for transmission, but it does not amount to the quantitative analysis necessary to find a significant risk.
The district court’s willingness to hypothesize is best exemplified by its treatment of certain out-of-the-prison programs.[15] Although inmates are supervised by corrections officers during such programs and although the court conceded that “[t]he probability that the HIV disease will be transmitted is not significant” in supervised programs, Op. at 152, the court nevertheless rejected appellants’ claims that they were “otherwise qualified.” The court reasoned:
[I]n the prison system, one must always be prepared for the unexpected. An automobile or other accident may incapacitate a guard and leave the inmates on the out-of-the-prison detail free to proceed without an escort. An inmate, temporarily healthy but facing the bleak future of all seropositives, may have controlling impulses vastly different from those of healthy inmates who may be more concerned about the penal aspects of their future.
If ... a correctional officer has been incapacitated in an accident, a female inmate with contempt for that officer could purposely implant, while the guard remains unconscious, blood containing HIV organisms from the HIV + inmate[’]s open wounds.
Op. at 153.[16] Thus, the court found segregation justified even though the likelihood of transmission in these programs depends, in this rather fanciful hypothetical situation, upon the unlikely coincidence of possibilities that an accident might occur, a guard might be wounded and rendered unconscious, and an HIV+ inmate might have both an open wound and a vendetta. It is exactly this kind of speculation that the significant transmission risk test guards against and that section 504 prohibits.[17]
These examples are by no means exhaustive and should not be read to suggest that proper application of the appropriate standard will necessitate seropositive inmates’ participation in all’ (or even the preceding) programs. To the contrary, the court may find, upon appropriately quantifying the risk inherent in certain activities, that integration is inappropriate. Appellants candidly admit,, for instance, that HIV+ prisoners might properly be excluded from “runner jobs,” in which inmates perform errands for DOC personnel and have tremendous access to various parts of the prison, often without supervision. Appellants’ Reply Br. at 12. We only hold that the district court erroneously required appellants to disprove all conceivable (and even fanciful) risks of transmission, and that this ruling requires remand for application of the proper standard.
3.
Our conclusion that the district court imposed too strict a burden on appellants does not end this case. Instead, we must address the court’s alternative ruling that prisoners invoking section 504 must clear a hurdle that non-inmate plaintiffs need not. Specifically, the court held that inmates’ statutory rights under the Act may be subordinated to correctional concerns, just as some of their constitutional rights may be.[18] Un *1335 der Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), “when a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.”[19] The district court held that appellants were not “otherwise qualified” unless they could prove both that they were capable of participating safely in the program (“the Arline test,” supra) and that their participation would not cause disciplinary problems (“the Turner test”). Because the district court found that there was a likelihood of violence whenever HIV+ inmates are mixed with general population prisoners, it concluded that the Turner test rendered appellants not “otherwise qualified.”[20] This holding is erroneous.
The district court’s freedom to determine the applicable “otherwise qualified” standard was constrained by the prior panel’s remand. In setting out what appellants had to prove on remand, the prior panel discussed only the Arline test. Harris, 941 F.2d at 1525-27. Such silence is significant because the court was acutely aware of the Turner test. Immediately prior to discussing section 504, the panel rejected appellants’ constitutional right to privacy claim under Turner. Id. at 1512-21. Crucially, appellants’ privacy claim attacked the same condition as their Rehabilitation Act claim — their segregation. If both causes of action were subject to Turner, then, the court should have rejected both upon determining that either failed the Turner test. Because the prior panel did not, we conclude that it ruled that the Arline test, unadorned by Turner, was applicable. On remand, that standard was the law of the case.[21]
As the law of the case, the prior holding bound the district court “unless the presentation of new evidence or an intervening change in the controlling law dictate[d] a different result, or the appellate decision [was] clearly erroneous and, if implemented, *1336 would work a manifest injustice.” Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1510 (11th Cir.1987) (en banc), cert. denied, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988). Neither circumstance is present in the instant case. Since this court’s prior opinion, neither this circuit nor the Supreme Court has suggested, much less held, that the Turner test applies to inmates’ claims under the Rehabilitation Act.
The panel’s refusal in Harris to superimpose Turner upon section 504 also was not clearly erroneous. Although we are aware that two of our sister circuits have stated that Rehabilitation Act claims ought to be subject to the Turner test, Torcasio v. Murray, 57 F.3d 1340, 1355-56 (4th Cir.1995) (dicta), cert. denied, — U.S.-, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996); Gates v. Rowland, 39 F.3d 1439, 1447 (9th Cir.1994),[22] there are several reasons why the Harris panel’s approach makes better sense. First, although Turner serves to restrain the judiciary from interfering in prison matters, a job best left to the legislative and administrative branches,[23] 482 U.S. at 84-85, 107 S.Ct at 2259, rights under the Rehabilitation Act emanate from those branches, and thus ought not be subject to Turner’s requirements without a congressional indication to that effect. Cf. Arline v. Sch. Bd. of Nassau County, 772 F.2d 759, 762 n. 8 (11th Cir.1985) (“We would be acting beyond our authority to read into section 504 limitations which Congress chose not to establish when it clearly could have done so.”), aff'd, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Second, the Turner test is in some ways duplicative of the inquiry under the Act. Applied in the prison setting, section 504’s reasonable accommodation and undue burden inquiries, like Turner’s inquiry, consider the practicalities of accommodating individual rights within established programs and do not require integration where it would pose serious problems that cannot be eliminated consistent with effective and efficient prison administration. The Act thus mandates judicial consideration of interests particular to the prison system. Finally, it has not been this court’s practice to subject prisoners!, statutory claims to the Turner test. See, e.g., Gambetta v. Prison Rehabilitative Indus. & Diversified Enters., Inc., 112 F.3d 1119, 1123 n. 4 (11th Cir.1997) (holding that prisoners not categorically excluded from protection of Fair Labor Standards Act; rejecting blanket exemption from statute where program in question serves rehabilitative purpose); Lawson v. Singletary, 85 F.3d 502, 508-11 (11th Cir.1996) (holding that prisoners covered by Religious Freedom Restoration Act to extent intended by Congress).[24]
Thus, the district court erred by grafting Turner’s constitutional standard onto this court’s stated statutory test. We therefore hold that the district court’s judgment cannot be affirmed based upon its alternative Turner rationale.
4.
Appellants next assert that the district court prohibited them from proving that a reasonable accommodation exists that would make them “otherwise qualified.” Specifically, they object to the court’s exclusion of evidence of DOC’s ability to conduct, as a precondition to program participation, an individualized assessment of seropositive *1337 inmates’ propensities to engage in high-risk activities. We conclude that the district court erred.
On several occasions during trial, appellants sought to introduce evidence about the prison classification process, but the district eourt prohibited them from doing so. For instance, appellants attempted to elicit testimony explaining Limestone’s and Tutwiler’s “job boards” and “classification teams,” which together gather psychological, penological, and behavioral data about all inmates and consider such information in making program recommendations and assignments. The district court ruled that, because this case was remanded for a program-by-program assessment of risk, see supra note 5, it was precluded from considering evidence about DOC’s ability to make, within programs, inmate-by-inmate determinations of eligibility. The district court therefore assumed that DOC’s capacity to select inmates who do not pose a significant risk of transmitting HIV was not relevant to the ease on remand.
To the contrary, appellants’ proffered evidence was central to the question before the district court. One of the things that appellants were required to prove on remand was that, if they could not participate in prison programs safely under current conditions, there existed reasonable accommodations that would allow seropositive prisoners to be integrated safely. A mechanism whereby those least likely to engage in high-risk behavior would be selected for a program may be an accommodation that could reduce the risk of transmission to an insignificant level in a particular program. Further, appellants offered to prove that such accommodation was reasonably affordable and administratively feasible, also relevant to the court’s reasonable accommodation determination, as DOC already classifies prisoners and recommends them for various programs based upon their individual histories. Thus, the district court abused its discretion in excluding evidence pertinent to a fundamental issue in the ease.[25]
We do not lightly upset a district court’s order based upon evidentiary error. Rather, “[w]e overturn evidentiary rulings only when the moving party has proved a substantial prejudicial effect.” Fed.R.Civ.P. 61; Judd v. Rodman, 105 F.3d 1339, 1341 (11th Cir.1997). Here, however, we already have decided that remand is necessary. Further, by negating one of appellants’ principal arguments— namely, that they could be accommodated reasonably — the district court’s error itself necessitates remand because it calls into question the propriety of the court’s judgment on the merits with respect to each program for which appellants suggested individualized assessment as a reasonable accommodation. “Since the district judge’s ruling precluded [the plaintiff] from establishing a prima facie claim, it cannot be characterized as harmless error.” Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1544 (11th Cir.1994).
5.
The prior panel’s remand demanded an inquiry into each prison program from which appellants had been excluded. The district eourt, however, instructed the parties that it would not entertain argument about several programs that are not held on site at Limestone or Tutwiler but that are available to general population inmates from both facilities. Specifically, the court refused to consider appellants’ potential integration into work release programs, correctional industries, residential substance abuse programs, a sex offender treatment program, and boot camps.[26] Appellants contend that these programs fall within the scope of the remand and that it was therefore error to prevent them from proving that they could participate safely.
Appellants’ argument is well taken. The prior panel’s remand was not so limited; it *1338 directed the court to consider “each program and activity from which HIV-positive prisoners are being excluded.... ” Harris, 941 F.2d at 1527. Indeed, the panel even mentioned work release as a program in which appellants have been denied participation. Id. at 1522 n. 40. In view of the Rehabilitation Act’s expansive definition of “program or activity,” see 29 U.S.C. § 794(b)(1)(A) (holding that “program or activity” includes “all of the operations” of state agencies and departments receiving federal funds), we agree with appellants that the off-site programs appear to have been a proper subject for retrial.[27] DOC responds that the prior panel ruled that segregated housing did not violate seropositive inmates’ right to privacy and, because these off-site programs are residential in nature, impliedly held that such activities fall outside of section 504. This argument proves too much; by finding DOC’s practices constitutional, this court did not conclude that they comported with section 504. Otherwise, there would have been no reason for a remand to assess whether program segregation violated the statute.[28]
Our conclusion does not command that these programs be integrated. We express no opinion on that subject, especially given the emptiness of the record regarding such activities. We hold only that the district court must consider whether section 504 mandates integration.
6.
The parties and the district court agree that certain programs could be integrated safely by adding corrections personnel, in some cases a single officer. The district court, however, rejected appellants’ argument that DOC should add staff as an accommodation. Because DOC does not receive from the Alabama legislature all of the funds it requests and because its funding had, at the time of trial, recently been reduced, the district court found that the addition of even a single corrections officer to integrate HIV+ inmates into certain programs would impose an undue burden upon DOC. This determination was clearly erroneous.
Appellants carried their burden of showing that hiring an additional officer is financially reasonable “ ‘in the run of cases,’ ” Willis v. Conopco, 108 F.3d 282, 286 n. 2. (11th Cir.1997) (quoting Barth v. Gelb, 2 F.3d 1180, 1187 (D.C.Cir.1993)), by demonstrating that a new officer would not occupy an unreasonably large portion of DOC’s budget. It is uncontested that DOC’s operating budget was $178 million in 1993 and $163 million in 1994. It is also uncontested that the first-year cost of an additional corrections officer is $24,483. Appellants satisfied their burden by citing these stipulated figures. See United States v. Bd. of Trustees for the Univ. of Ala., 908 F.2d 740, 751 (11th Cir.1990) (“In light of UAB’s annual transportation budget of $1.2 million, an expenditure of $15,000, plus occasional amounts ..., is not likely to cause an undue burden on UAB.”) (citations omitted).
Consequently, to be permitted to segregate HIV + inmates from a program where a single officer would provide adequate safety, *1339 it is DOC’s duty to demonstrate that hiring one new officer is unreasonable “ ‘in the context of the particular agency’s operations.’ ” Willis, 108 F.3d at 286 n. 2. This DOC has not done. That DOC receives fewer funds than it requests or that it has fewer officers than it would like says nothing about its ability to hire a single officer within its current budget. Trial evidence indicated that DOC has tremendous spending discretion within its budget and can request necessary additional funds from the legislature. Additionally, a defense witness conceded that DOC would save money if it were to discontinue some of the “separate but equal” programs currently operated for seropositive prisoners. Such funds presumably could finance an additional guard to facilitate integration.
We therefore conclude that, based upon the evidence before it, the district court clearly erred in finding that any expenditure by DOC to hire additional staff would be an “undue burden.” We leave open on remand the possibility that sufficient evidence may be adduced as to the unreasonableness of adding even a single guard, but note that DOC must show that such an accommodation would be unreasonable given the demands of its present budget. See 28 C.F.R. § 42.511(c) (stating that undue hardship inquiry should consider “(1) [t]he overall size of the recipient’s program with respect to number of employees, number and type of facilities, and size of budget; (2) [t]he type of the recipient’s operation, including the composition and structure of the recipient’s workforce; and (3) [t]he nature and cost of the accommodation needed”).[29]
C.
To summarize, we hold that the district court correctly allocated the burdens of persuasion at trial. We vacate the judgment of the district court and remand for further proceedings, however, because the district court determined that appellants were not “otherwise qualified” based upon two errors of law: (1) the court required appellants to disprove all conceivable risks of transmission in prison programs, even though the statute requires only the elimination of significant risks; and (2) the court disqualified appellants from programs in which penological interests, such as eliminating completely the potential for inmate violence, purportedly justified segregation. On remand, the district court must reassess whether appellants are “otherwise qualified” in light of our decision. Moreover, the court should consider evidence that demonstrates DOC’s ability to integrate programs by selecting only those individuals unlikely to engage in high-risk behavior. The court also must examine the possibility of integrating the off-site programs discussed in section II.B.5. Finally, the court should not find that DOC has satisfied its burden of proving that suggested accommodations are unreasonable simply upon a showing that DOC receives less than its requested level of funding from the state or upon a showing that DOC has fewer officers than it would like.[30]
III.
Near the beginning of trial on remand, appellants moved to recuse Judge Varner from hearing the case. They appeal the district court’s denial of that motion, claiming that recusal was required because the son of DOC’s lead counsel is Judge Varner’s law clerk and because Judge Varner revealed that he discussed the case with his son, a doctor, who expressed his view that there was a risk of HIV transmission in some of *1340 the programs at issue on retrial. We review the judge’s recusal ruling for an abuse of discretion. Loranger v. Stierheim, 10 F.3d 776 (11th Cir.1994). On appeal, appellants forward an additional ground for disqualification; they claim that the judge’s trial comments evinced a pervasive hostility toward the members of the appellant class. We are concerned by the allegation that the judge and his son discussed disputed matters, but avoid deciding whether recusal was necessary. The remaining allegations are not disqualifying.
The relevant provisions of the recusal statute read as follows:
(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding....
28 U.S.C. § 455. Appellants argue that Judge Varner’s trial comments and the hiring of DOC’s counsel’s son create a reasonable question about the judge’s partiality under section 455(a) and that Judge Varner’s discussion with his son gave him knowledge of disputed facts in violation of section 455(b)(1). In the alternative, appellants claim that all of these facts considered together would lead a reasonable person to question the judge’s impartiality. See Parker v. Connors Steel Co., 855 F.2d 1510, 1525-26 (11th Cir.1988), cert. denied, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989) (adopting totality of the circumstances approach in evaluating allegations under section 455(a)).
At trial, Judge Varner made a number of comments that appellants claim demonstrate his bias against inmates with HIV. The parties agree that the judge’s bias, if any, did not stem from an extrajudicial source. As such, recusal under section 455(a) is only required if the comments reveal an antipathy for appellants intense enough to make fair judgment impossible. Liteky v. United States, 510 U.S. 540, 554-56, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).
We conclude that the judge’s trial statements do not indicate a bias so severe as to call into question the fairness of the trial. The court opined on numerous occasions that inmates are unpredictable and untrustworthy, and it also pressed DOC’s counsel to elicit trial testimony about the horrors of dying from AIDS. The former statement is perhaps an unfair generalization insofar as it applies to certain members of the appellant class, but it is not proof of severe prejudice. See id. (referring, as example of disqualifying bias, to case where district court allegedly professed difficulty in objectivity toward German-Americans because their “ ‘hearts are reeking with disloyalty’ ”) (quoting Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921)). The latter statement is unobjectionable; the court requested evidence on the amount of suffering involved in advanced cases of HIV infection because it believed such information was part of the legal test that it had to apply.[31]
Appellants also allege that Judge Varner was obligated to recuse himself under section 455(a) because the fact that his law clerk’s father was lead counsel for DOC creates a reasonable question about the judge’s impartiality. It is true that a law clerk’s involvement in a case and his or her relationship to one of the parties may constitute grounds for the judge’s disqualification. See, e.g., Parker, 855 F.2d at 1524-25 (recusal was required where judge’s clerk was son of senior partner in firm representing party, the father was himself a former law clerk to the judge, the son held a hearing with the parties present but not the judge, and the judge thanked the law clerk in his order for the clerk’s extensive work on the case).
*1341 Law clerk conflicts, however, are not necessarily judicial conflicts, and we conclude that Judge Varner did not abuse his discretion in denying disqualification on this ground. The court stated unequivocally in its order that the clerk had no involvement in this case, and the clerk’s father submitted an affidavit representing that he instructed his son not to take any action with regard to the suit. These averments satisfy us that disqualification was not required. See Parker, 855 F.2d at 1525 (recusal “might have been avoided if [the judge] would have taken steps to isolate [the clerk] from this case”); Hunt v. American Bank & Trust Co., 783 F.2d 1011, 1015-16 (11th Cir.1986) (“If a clerk has a possible conflict of interest, it is the clerk, not the judge, who must be disqualified.”).
As a final basis for disqualification, appellants allege that, during an in-chambers status conference, Judge Varner revealed that he had discussed disputed material issues with his son. Counsel for appellants testified that “Judge Varner stated that he had spoken with his son, who is a doctor, about transmission of the virus and that his son had told him that there was a risk of transmission in some of the contexts subject to retrial on remand.” Affidavit of Margaret Winter, Sept. 6,1994, at 1-2. DOC’s counsel rejoined that “Judge Varner did not make any statement closely resembling” appellants’ account. Affidavit of David Byrne, Jr., Sept. 8, 1994, at 2. DOC contends that the discussion in chambers concerned the issue of how HIV can be transmitted, that Judge Varner expressed his view that the medical community was divided on the issue, and that Judge Varner also mentioned his son’s illegible handwriting, but that the latter statement was unconnected to the prior discussion about issues for trial. Id. For his part,' Judge Varner did not deny that the conversation took place, nor did he dispute appellants’ characterization of the substance of the discussion. Instead, the court held that the conversation could not form the basis for recusal because of the court’s conclusion that the reported statements were not disputed in the case; the court then quoted portions of this court’s prior opinion acknowledging that the risk of HIV transmission exists in prisons generally. Opinion of Sept. 19, 1994, at 11-12.
Extrajudicial fact-finding by a judge is improper because it cannot be “tested by the tools of the adversary process.” Edgar v. K.L., 93 F.3d 256, 259 (7th Cir.1996), cert. denied, — U.S. -, 117 S.Ct. 949, 136 L.Ed.2d 837 (1997). That is, “ ‘a judge cannot be, or cannot appear to be, impartial if he has personal knowledge of evidentiary facts that are in dispute.’ ” United States v. Alabama, 828 F.2d 1532, 1545 (11th Cir.1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988) (quoting Thode, Reporter’s Notes to Code of Judicial Conduct 62 (1973)). Consequently, section 455(b)(1) creates a self-enforcing duty to recuse if a judge, outside of his or her judicial capacity, gains knowledge of facts material to the case. Id.
Whether section 455(b)(1) mandated disqualification is a difficult question based upon the record before us. We cannot tell from the parties’ representations or the court’s order what information Judge Varner’s doctor-son may have conveyed-to him. It is unclear, for instance, what appellants’ counsel meant by the phrase “some of the contexts subject to retrial on remand.” Consequently, we are unable to assess whether the conversation covered the risks of transmission in prison programs, an issue that is both material to the case and in dispute. Given those circumstances, we could remand for a hearing into the nature of the alleged conversation, see Easley v. University of Mich. Bd. of Regents, 853 F.2d 1351, 1358 (6th Cir.1988), so that we might better assess whether disqualification was necessary, but we do not do so here. We think it wise to reserve judgment on whether or not Judge Varner’s conversation with his son required recusal under section 455(b)(1). Likewise, we decline appellants’ invitation to find Judge Varner’s conduct inappropriate under section 455(a)’s more general proscription against partiality.
Instead, we invoke this court’s supervisory authority over the courts of this circuit and chart a middle course. Because we are remanding this case for further proceedings, reassignment to a different judge is an option pursuant to 28 U.S.C. § 2106, which permits courts of appeals to “require *1342 such further proceedings to be had as may be just under the circumstances.” In deciding whether to reassign, we consider whether the district judge would have difficulty putting his or her previous views and feelings about a case aside on remand, whether assignment to a new judge is appropriate to preserve the appearance of justice, and whether reassignment will create such waste and duplication as to outweigh its benefits. Chudasama v. Mazda Motor Corp., 123 F.3d 1353 (11th Cir.1997); United States v. Remillong, 55 F.3d 572, 577-78 n. 12 (11th Cir.1995).
Even a cursory review of the district court’s order reveals Judge Varner’s unwillingness to put aside the conclusions he reached after the first trial. In response to the district court’s blanket conclusion after the original trial that appellants were not “otherwise qualified” because high-risk behavior occurs in prisons, the prior panel directed the district court to examine each challenged program, stating that “general findings and prison policy” could not justify segregation. Harris, 941 F.2d at 1527. Nevertheless, on remand, the district court relied heavily on generalization and deference to prison policy in rejecting appellants’ claims. In each program for which the court determined that appellants were not “otherwise qualified,” it found that high-risk behavior and violence against seropositive inmates were likely because they occur in prisons generally.[32] Further, the court gave unbridled deference to the decisions of prison officials, repeating the following statement either verbatim or in substance in its analysis of nearly every challenged program:
This Court is .ill-suited to instruct prison officials on the likelihood of the occurrence of high risk behavior. This Court is even more ill-suited to instruct the prison system on when and how to prevent such conduct when they [sic], along with their managers and medical officials, determine that such conduct is likely. Because Defendant/Prison system has decided that such conduct is likely, and because of the catastrophic severity of the consequences if such conduct does occur, this Court holds that integrating [the specific program] would present a significant risk of transmitting the deadly HTV virus.
Op. at 63; see also passim. The district court’s deference to policy makers, however, led it to abandon its judicial role. See, e.g., id. at 461 (“Regardless of how much evidence is presented, no court will ever be as qualified as prison officials to judge the particular needs of a penal institution.”) (emphasis added).[33]
Reassignment is also necessary to preserve the appearance of justice. First, we believe that-reasonable people, would be troubled by the judge’s alleged conversation with his doctor-son about the case and about disputed evidence in addition to the court’s unwillingness to forego generalizations about prison in analyzing particular programs. Although we lack sufficient evidence to conclude that the discussion mandated recusal, we are convinced that the situation is questionable enough to warrant reassignment. Second, the court brushed aside both precedent, see supra note 6, as well as the prior panel’s remand, see supra sections II.B.3. & 5, to rule against appellants. Finally, appellants’ other grounds for disqualification, although alone insufficient to mandate recusal, add to the totality of the circumstances and increase the appearance of injustice.
We are not unmindful that this case is substantial, having spawned a voluminous record and having been litigated for nearly ten years. At the same time, however, we note that the first appeal of. this case disposed of all but one of appellants’ constitutional claims, and appellants have not now appealed the second denial of the remaining *1343 claim. Thus, the only issue left is the program-by-program analysis under section 504. This will surely involve additional fact finding, but we are convinced that this additional burden is outweighed by the needs of justice and by Congress’ broad mandate that “[n]o otherwise qualified handicapped individual ... shall, solely by reason of his handicap, ... be subjected to discrimination under any program or activity receiving Federal financial assistance____” 28 U.S.C. § 794.
IV.
Accordingly, the decision of the district court is VACATED. We REMAND for further proceedings consistent with this opinion and with the direction to the Chief Judge of the Middle District of Alabama that the case be REASSIGNED to a different district judge for further proceedings.

. Specific information regarding the testing and segregation process and the epidemiology of HIV infection can be found in Judge Fay's thoughtful and exhaustive opinion in the prior appeal of this case. We presume familiarity with that opinion.

. The class’ constitutional claim concerning access to the courts was remanded for additional factual findings and Cor clarification of the district court’s prior order. Harris, 941 F.2d at 1528. The district court again denied relief on remand, and that issue has not been appealed.

. Subsequent to Arline, Congress amended the Act to clarify that, in the employment context, a person with a contagious disease could be an "individual with a disability” unless thaL person, "by reason of such disease or infection, would constitute a direct threat to the health or safety *1328 of other individuals or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job.” Civil Rights Restoration Act of 1987, Pub.L. No. 100-259, 102 Slat. 28 (codified at 29 U.S.C. § 706(8)(D)). The intent of this amendment was to codify the Arline standard. See 134 Cong. Rec. S1739 (daily ed. Mar. 2, 1988) (statement of Sen. Harkin) ("[T]he purpose of the amendment was to clarify — and not to modify in any way— the protections of section 504, as they apply to individuals with contagious diseases or infections. The amendment is consistent with the Supreme Court decision in [Arline J.”); see also EEOC v. Amego, Inc., 110 F.3d 135, 143 (1st Cir.1997).

. Appellants challenge their segregation from numerous programs, including religious services, rehabilitation programs (including drug and alcohol abuse classes), prison visitation, vocational classes (ranging from data processing to welding), organized recreational activities, dining hall use, medical clinic visits, out-of-the-prison programs, educational programs (including GED and college courses), a number of prison jobs (such as data entry, errand running, kitchen and laundry jobs, maintenance and housekeeping duty, and work in prison factories), and library use. HIV + prisoners may participate in some of these activities separately; other programs are unavailable to seropositive inmates.

. Appellants also contend that the district court misinterpreted the prior panel's opinion by refusing to consider whether individual members of the appellant class were "otherwise qualified” or could be made so with reasonable accommodation. They argue that if they can show that one of their number can be integrated safely into a prison program, then the class as a whole is entitled to a declaration that the categorical ban on seropositive inmates' participation in that program violates the Act. This argument is not without appeal, especially in view of section 504's preference for individualized treatment. See, e.g., Arline, 480 U.S. at 284, 107 S.Ct. at 1129 ("The fact that some persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act all persons with actual or perceived contagious diseases.”). Moreover, common sense tells us that if one class member can establish his or her eligibility for a prison program, then the categorical ban is in tension with section 504’s goals. Nevertheless, we conclude that the prior opinion in this case precludes an inquiry that focuses on a particular individual's eligibility for specific programs. The panel directed the district court to determine whether appellants were "otherwise qualified” in light of "the risk of HIV transmission with regard to each program," 941 F.2d at 1526, and "to examine as to each program whether 'reasonable accommodations' by the DOC could minimize such a risk to an acceptable level.” Id. at 1527 (emphasis added). Because the prior panel directed the district court to undertake such an inquiry and because a program-level assessment of risk in this case is not plainly inconsistent with section 504, see Arline, 480 U.S. at 287, 107 S.Ct. at 1131 (individualized inquiry is necessary "in most cases,” but not all), we reject appellants' argument based on the law of the case doctrine.

. The district court noted that Treadwell v. Alexander, 707 F.2d 473 (11th Cir.1983), and Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir.1993), "appear[] to have placed a more stringent burden upon defendants in a Rehabilitation Act claim,” Op. at 20, than did Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), in a Title VII case. Consequently, it refused to follow Tread-well and Fitzpatrick, even though it thought that they were on point and binding, and even though they came after Burdine. This was improper for obvious reasons.

. See also Fitzpatrick, 2 F.3d at 1127 n. 17 (dicta) (burden of persuasion on reasonable accommodation issue rests with defendant); Prewitt v. United States Postal Serv., 662 F.2d 292, 308 (5th Cir. Unit A Nov. 1981) (same).

. It was uncontested at trial that the normal progression of HIV infection leads to an AIDS-related death. By the time that the facts of this case are considered anew, that fact may have changed. On remand, we leave it to the district court's discretion how best to discharge its responsibility to assess the dangers of HIV infeclion “based on reasonable medical judgments given the state of medical knowledge. ...” Arline, 480 U.S. at 288, 107 S.Ct. at 1131 (internal quotation omitted) (emphasis added).

. We are aware that the district court occasionally used the correct legal terminology, but we *1333 attach no importance to its choice of words because it is apparent that the court would find a “significant” risk even where it conceded none existed. Compare Op. at 155 ("this Court holds that integrating the out-of-the-prison programs would present a significant risk of transmitting the deadly HIV virus”), with id. at 152 ("The probability that the HIV disease will be transmitted is not significant in the [out-of-the-prison] programs where inmates are supervised by correctional officers....”).

. The court repeated this reasoning in its analysis of 27 of 79 programs it considered at Limestone and Tutwiler.

. This rationale appeared 23 times in the opinion.

. The court discussed and dismissed the job board on twelve separate occasions in its opinion.

. The court justified segregation based on the possibility of HIV transmission from fighting in sixteen different programs.

. The court's speculation is especially inappropriate after it excluded evidence of the job board's effectiveness. See infra section II.B.4.

. Such programs include, for example, the Medium Custody Road Squad, in which inmates are supervised while cutting grass and picking up trash alongside roadways by an armed guard.

. The court used this identical reasoning to reject integration in 6 separate programs.

. Indeed, we submit that the district court's guesswork in these programs would fail even its own test, which prohibits segregation based on a theoretical risk of transmission.

.The dissent, although conceding that the Act applies to state prisons as the law of the case, suggests that "the issue may merit en banc attention.” Because the law of the case doctrine precludes us from redeciding this issue, we cannot quarrel here with the Fourth Circuit's recent decision in Amos v. Md. Dep't of Pub. Safety & Correctional Servs., 126 F.3d 589 (4th Cir.1997), that the Act does not apply to state prisons. We *1335 note, however, that DOC has conceded in this litigation that section 504 is a remedy available to state prisoners. See Harris, 941 F.2d at 1522. Moreover, other circuits have squarely confronted the issue and held that state prisoners are entitled to protection under the Act. See Yeskey v. Comm. of Pa. Dep’t of Corrections, 118 F.3d 168, 174 (3d Cir.1997); Crawford v. Ind. Dep’t of Corrections, 115 F.3d 481, 487 (7th Cir.1997); Bonner v. Lewis, 857 F.2d 559, 562 (9th Cir.1988). The only other circuit to hold that the Act does not apply to state prisoners did so in a cursory manner. In Williams v. Meese, 926 F.2d 994, 997 (10th Cir.1991), the court held that a federal prisoner was not entitled to protection under section 504 because the "Federal Bureau of Prisons does not fit the definition of 'programs or activities’ governed by that section.” In White v. Colorado, 82 F.3d 364, 367 (10th Cir.1996), the court cited Williams, without significant discussion, for the categorical proposition that the Act "does not apply to issues of prison employment.”

.Under Turner, several factors bear on a regulation's validity:
(a) whether there is a "valid, rational connection” between the regulation and a legitimate government interest put forward to justify it;
(b) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and (d) whether the regulation represents an "exaggerated response” to prison concerns.
Harris, 941 F.2d at 1516.

. Turner was the sole ground on which the district court rejected appellants' participation in certain programs. See, e.g., Op. at 369-76 (Limestone staff barber jobs). Usually, however, the court cited Turner as a justification for segregating HIV+ inmates after having found that they could not satisfy Arline.

. The district court suggested that this court's prior opinion inserted the Turner test sub silentio, citing two occasions where the court referred to the interests of prison officials. See Harris, 941 F.2d at 1522 n. 41 (noting the "congruence of the Act's goals with those of prison officials”); id. at 1527 (noting that the Act balances rights of disabled inmates against “the legitimate concerns of the prison-grantee"). Neither of these statements suggests that the Turner test applies, nor are they inconsistent with applying section 504’s test alone; consideration of prison needs is appropriate within the statutory framework because the Act's reasonable accommodation and undue burden inquiries are always contextual. In Crawford v. Ind. Dep’t of Corrections, 115 F.3d 481, 487 (7th Cir.1997), for example, the court cited Turner and noted that "[tjerms like 'reasonable' and 'undue' are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized in the parallel setting of prisoners’ constitutional rights." The court did not, however, hold that Turner might render lawful an otherwise clear case of disability discrimination.

. The Third Circuit has "flagged” this issue, but has not yet determined whether Turner applies to claims under section 504 or the ADA. Yeskey v. Commonwealth of Pa. Dep’t of Corrections, 118 F.3d 168, 175 (3d Cir.1997).

. Of course, Turner also serves federalism concerns by keeping federal authority out of state prison management unless it is clear that Congress intended such an intrusion. See Torcasio, 57 F.3d at 1345. This reasoning, however, does not justify subjecting the Rehabilitation Act to Turner's limits because we already have decided that the Rehabilitation Act applies to state prisons. See Harris, 941 F.2d at 1522 n. 41; supra note 18. The dissent takes us to task for "second-guessing the legitimate penological decisions of state authorities." Because such review of DOC's decisions has been legislatively mandated (or, to use the dissent’s more innocuous phrase, “statutorily prompted”) by section 504, however, our inquiry here does not "run[] squarely counter to the most basic notions of comity,” but rather fulfills the role Congress has'created for the courts.

.The court in Lawson actually subjected the inmates' claim to the Turner test, but only because it determined that Congress so intended. The opinion clearly indicates, however, that Congress' intent, and not the simple fact of incarceration, determines the scope of inmates' statutory rights.

. The district court impliedly recognized this error in its opinion by attempting to evaluate individual assessment as a reasonable accommodation. The court then rejected such accommodation based upon the fallibility of the selection process. Its ruling, however, is tainted by the fact that it excluded evidence tending to shed light on the ability of DOC to predict high-risk behavior reliably.

. The district court also ruled that it would not consider integrating HIV + prisoners into general population housing. Appellants objected to that decision, but did not raise it on appeal. We deem the issue abandoned. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n. 6 (11th Cir.1989).

. See also 28 C.F.R. § 42.540 ("program” includes the operations of department of corrections); Nondiscrimination Based on Handicap in Federally Assisted Programs, 45 Fed.Reg. 37,620, 37,630 (1980) (listing corrections agencies obligated to make, including structural modifications to accommodate disabled persons, "jails, prisons, reformatories and training schools, work camps, reception and diagnostic centers, pre-release and work-release facilities, and community-based facilities”).

. In rejecting appellants’ argument, the district court also relied in part on the fact that, under Meachum v. Fano, 427 U.S. 215, 224-25, 96 S.Ct. 2532, 2538-39, 49 L.Ed.2d 451 (1976), inmates have no constitutional right to be housed at a specific facility. We have no quarrel with the court’s statement, as far as it goes. It is true that, absent some state law entitlement to be housed in a particular place, an inmate does not have an interest protected by procedural due process in avoiding transfer. See id.; Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). To say this, however, does not absolve prison officials of their responsibility to comply with other substantive guarantees of federal law; just as an equal protection challenge would be proper if prison authorities chose to incarcerate blacks and whites in separate prisons, see Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), so, too, is a Rehabilitation Act challenge appropriate where prison authorities choose separate facilities for the disabled.

. Although this provision is located in a section of the Department of Justice’s Rehabilitation Act regulations titled "Employment," the first and third factors it suggests are equally relevant to evaluating whether an accommodation would be an undue burden in a non-employment case.

. We do not reach several issues argued on appeal. First, DOC contends that it may face liability in suits by prisoners and the public if programs are integrated and innocents are infected. Second, appellants challenge several of the district court’s factual findings, including its reliance on the "Ingram Study,” an inmate opinion survey purporting to show an increased likelihood of violence after integration, and its conclusion that certain behavior (sex between women, sports, fighting, and sharing barbering equipment) posed a high risk of HIV transmission. Third, DOC suggests that the Prison Litigation Reform Act, IS U.S.C. § 3626, limits appellants’ ability to secure sweeping injunctive relief. On remand, the district court is free to examine these issues' bearing on the merits of appellants’ claims and, if appropriate, on the necessity and scope of relief.

. Arline's fourth factor is "the probabilities the disease will be transmitted and will cause varying degrees of harm.” 480 U.S. at 288, 107 S.Ct. at 1131 (quotation omitted). In chambers, the court merely inquired about the phrase "will cause varying degrees of harm.” We do not necessarily agree with the court’s view of this snippet of Arline (as the balancing test already accounts for "the severity of the risk”), but appellants unfairly take the court's legal inquiry out of context.

. Specifically, the district court selected segments of this court’s prior opinion — wherein the panel observed that "the elimination of high risk behavior ... is impossible," id. at 1520, and that total integration of the prison "could likely degenerate into active violence,” id. at 1518 — and then slated that there is no reason to believe that these general observations about prison are not also true of specific programs. The court repeated these end-runs around the prior panel's remand in discussing no less than 39 of 43 programs at Tutwiler.

. The court also imposed the Turner test upon appellants’ prima facie case, thereby giving prison officials added deference. See supra section II.B.3.