United States Court of Appeals,

Eleventh Circuit.

No. 96-4253.

Juan GAMBETTA, Plaintiff-Appellant,

v.

  PRISON REHABILITATIVE INDUSTRIES AND DIVERSIFIED ENTERPRISES,
INC., Pamela J. Davis, President and Member of the Board of
Directors of PRIDE, Inc., J. Floyd Glisson, former President and
Member of the Board of Directors of PRIDE, Inc., State of Florida
Department of Corrections, Harry K. Singletary, Secretary, State of
Florida Department of Corrections, in his individual capacity,
Defendants-Appellees,

 Richard L. Dugger, former Secretary, State of Florida Department
of Corrections, in his individual capacity, Defendant.

May 15, 1997.

Appeal from the United States District Court for the Southern
District of Florida. (No. 93-592-cv-DTKH), Daniel T.K. Hurley,
Judge.

Before ANDERSON and EDMONDSON, Circuit Judges, and ROSENN[*], Senior
Circuit Judge.

     ROSENN, Senior Circuit Judge:

     This appeal presents an important question of economic and

penological concern of first impression in this circuit, wherein

prisoners incarcerated for violations of Florida criminal laws seek

the benefits of federal minimum wage laws when they engage in

correctional work programs operated by a non-profit corporation

established by the State.  In its entirety, this question would

require that we explore largely uncharted waters, in that neither

the Supreme Court nor the courts of appeals have addressed the

matter comprehensively.  Because we conclude as a matter of law,

     [*]The Honorable Max Rosenn, Senior U.S. Circuit Judge for the
Third Circuit, sitting by designation.

however, that the employer in this matter is a state instrumentality, we need pursue only a more limited inquiry. The result of that inquiry is that we affirm the district court's grant of summary judgment in favor of the defendants.

## I.

Chapter 946 of the Florida Statutes mandates that a private, non-profit corporation be established, independent of the state, to operate the correctional work program for the state Department of Corrections (DOC). Since 1981, the program has been operated by Prison Rehabilitative Industries and Diversified Enterprises, Inc. ("PRIDE"). Using prisoner labor, PRIDE manufactures and produces a wide range of products which it sells both internationally and to government entities in this country. In order to prepare inmates for release, PRIDE simulates a real-world business environment: inmates complete employment applications and are interviewed, receive on-the-job training and performance evaluations, and can file grievances and be terminated for cause. PRIDE currently pays inmate workers 45 to 50 cents per hour, some of which goes to repay the cost of incarceration, some to victim restitution, and some into the inmate's account.

In 1993, plaintiff Juan Gambetta, for himself and other Florida inmates, filed suit in the United States District Court for the Southern District of Florida, alleging that PRIDE had violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (1992), by failing to pay them minimum wages prescribed by the Act. Named as defendants were DOC, its past and present Secretaries, PRIDE, and its past and present Presidents. For the purpose of this

review, we assume that DOC and its officials are no longer involved in the suit, having been dismissed for all but injunctive purposes. The district court granted summary judgment to PRIDE,[1] holding that plaintiffs are not "employees" of PRIDE, and plaintiffs timely appealed.[2]

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is genuine if the record as a whole could lead a rational trier of fact to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is inappropriate at the summary judgment stage for the court to weigh the evidence and determine the truth of the matter. *Id.* at 249, 106 S.Ct. at 2510-11. Rather, the court's function is to determine whether there exists an issue for trial.

The appellants contend that the district court erred in granting summary judgment to the defendants because PRIDE is a private corporation that is granted a monopoly to operate the

---

[1]We affirm, although not precisely on the same ground. An appellate court may affirm a correct judgment of the district court even if that decision may be based on another ground. *Powers v. United States,* 996 F.2d 1121, 1123-24 (11th Cir.1993).

[2]The district court had federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 and we have jurisdiction pursuant to 28 U.S.C. § 1291 as an appeal from a final order.

state's correctional industries, generating over $70 million in annual revenues, paying its executives and outside lawyers and lobbyists handsome salaries and fees, and competing against other companies engaged in interstate commerce. They, therefore, vigorously argue that PRIDE is not exempt from federal minimum-wage requirements, that inmates participating in PRIDE's correctional programs meet the definition of "employee" under the FLSA, and that they are not exempt from coverage.

On the other hand, the appellees note that PRIDE's primary mission in operating the correctional industries is to reduce inmate idleness and promote rehabilitation and job-training by "duplicating, as nearly as possible, the operating activities of a free-enterprise type of profitmaking enterprise." § 946.501 Fla.Stat.[3] Appellees assert that inmate activities, however, are still governed by state law and agreements between the DOC and PRIDE by which the Department retains ultimate control over placement of the inmates and that, as structured, PRIDE is an instrumentality of state government.

PRIDE conducts its operations independently of state government and its policies and salaries are established by its Board of Directors. The Board determines policies, reviews its financial condition, and approves the corporation's annual operating budget. Its president reports to the Board and is in charge of the company's day to day operations. The Board hires, discharges, and pays its employees (non-inmates) and ostensibly

---

[3]All sectional references in this opinion, unless specifically designated otherwise, are to Florida Statutes.

operates as a private business, conducting its own accounting and purchasing system, manufacturing and shipping, and develops its own operating policies.  It receives no funding from the State.

Under state statute, PRIDE sells the products produced by inmates working in the State correctional programs only to agencies of the State, political subdivisions, other states, foreign entities, agencies of the federal government, or any contract vendor of such agencies.  § 946.515(1).  PRIDE may, however, sell agricultural goods to private entities.  § 946.515(3).  In 1992, the Florida legislature amended the statute creating PRIDE so as to provide that ""PRIDE' is deemed to be a corporation primarily acting as an instrumentality of the state."  § 946.5026.  The amendatory statute also provided that the provisions of § 768.28 defining "state agency" also shall apply to PRIDE.

Although the inmates may not be compelled to work for PRIDE, it is the DOC that statutorily determines which inmates may participate in the correctional work programs operated by PRIDE. § 946.511(1).  The DOC evaluates and prescribes education, work and work-training for each inmate entering the correctional system, and assigns the inmates.  The Department is required to review the inmate assignments every six months.  PRIDE's policies and procedures relating to the use of inmates in its correctional work programs must be submitted to the Department for approval.  § 946.511(2).

PRIDE, however, establishes policies and procedures which govern its non-inmate employees and, as to them, it is not required to follow the State's hiring or compensation policies.  PRIDE

retains outside consultants, attorneys, accountants, lobbyists, and public relations firms.  It is not required to comply with the State's bidding procedures in the purchase of goods, materials, and services for use in its correctional work programs.  PRIDE maintains its own purchasing and accounting systems and controls all manufacturing and shipping functions.

The salaries of PRIDE's non-inmate employees and its top managers have no relationship to salaries, pensions and benefits of state employers.  Although PRIDE contracts for its prison industry program with the State and is technically required to make lease payments, it has never made such payments although it maintains and makes capital improvements to property which belongs to the State.

The lease of facilities to PRIDE at each correctional work program are required by statute to be negotiated by Florida Department of Management Service and approved by the Attorney General, and the Governor and cabinet sitting as the Board of Trustees of the Internal Improvement Trust Fund. § 946.504(5)(b) and (c).  All of the property leased by the State to PRIDE, or subsequently purchased by it, is insured in behalf of the DOC through the Department's existing policy and account.  § 946.509. All of PRIDE's assets revert to full ownership of the Department when PRIDE ceases to utilize them.  § 946.505.  The State also provides PRIDE with liability insurance.  § 964.510.

PRIDE is exempt from the payment of sales taxes and is routinely audited by the Auditor General of the State.  It is required to report to the Governor and the legislature as to the status of its correctional work programs and submit an annual,

independently audited financial statement. § 946.516(1).

The statute initially setting up PRIDE as an independent entity in 1981 specifically provided that all members of its Board of Directors be appointed by the Governor of the State and confirmed by the Florida Senate. The Secretary of the DOC also sits on the Board of Directors.

## III.

The district court here granted summary judgment to PRIDE because it determined that the plaintiffs were not "employees" under the FLSA (D.C. op. at 6). Having reviewed the relevant authorities, the court concluded that the proper test to determine whether an inmate is an "employee" focuses on "(1) the goals sought to be achieved by the work program; and (2) the relationship between the Department of Corrections and the managing entity." (Id.) We decline to address the question of whether the district court applied the proper test,[4] and instead affirm solely on the basis that, as a matter of law, the "managing entity" (i.e., PRIDE) is a state instrumentality.

Appellants have presented considerable evidence that PRIDE

---

[4]We are particularly hesitant about endorsing the first factor. The district court believes that plaintiffs are not "employees" because the PRIDE program has at least in part a rehabilitative purpose. Presumably, *all* prison work programs have at least a small rehabilitative component, and so the court's reasoning might exclude *all* prisoners from FLSA coverage. Excluding all prisoners seems contrary to Congressional intent and runs counter to numerous statements made by various Courts of Appeals. *See, e.g., Danneskjold v. Hausrath,* 82 F.3d 37, 44 (2d Cir.1996); *Watson v. Graves,* 909 F.2d 1549, 1554 (5th Cir.1990); *Vanskike v. Peters,* 974 F.2d 806, 808 (7th Cir.1992); *Hale v. Arizona,* 993 F.2d 1387, 1392 (9th Cir.1993). The district court itself states that prisoners are not categorically excluded from the FLSA (D.C. op. at 3).

operates independently of the Department of Corrections. This evidence includes: statements made by the Secretary and former Secretary of DOC and by the president of PRIDE; the statement of legislative intent in Chapter 946 that the program authorized "can best operate independently of state government," § 946.502(5); PRIDE's position that it is exempt from state public disclosure laws; and expenditures made by PRIDE for lobbying, despite a Florida law forbidding the use of public funds for this purpose.

Although there may be some evidence to the contrary, we believe that significant evidence establishes that as a matter of law PRIDE is an instrumentality of the state. It is true that, as originally authorized, PRIDE was to operate "independently." In 1992, however, the Florida Legislature enacted § 946.5026, specifically providing that PRIDE "is deemed to be a corporation primarily acting as an instrumentality of the state." At least one Florida state court has held that § 946.5026 was enacted "merely to clarify and make entirely free from any doubt PRIDE's [previously] existing status...." *PRIDE v. Betterson,* 648 So.2d 778, 780 (Fla.Dist.Ct.App.1994). Also of great significance is the statutory control that the State has over the selection and appointment of the Board of Directors of PRIDE.

PRIDE's salaries for its top managers and its non-inmate employees bear no relationship to the salaries and emoluments of state employees. To a notable degree, PRIDE's operations are conducted independently of state government and its Board of Directors determines its policies, its operating budget, and entrepreneurial features. In the final analysis, however, power

and control over PRIDE and custody over the inmates is vested in the State.  By statute, all members of the Board are appointed by the Governor of the State and confirmed by the Florida Senate.  All of PRIDE's assets revert to full ownership of the State when it discontinues their use.  It is exempt from sales taxes, is audited by the State, and is required to report to the Governor and legislature on the status of its correctional programs, and to submit an audited financial statement.  There are other factors, especially the 1992 statutory amendment, which endow PRIDE with the characteristics of a state instrumentality.

We think it important to distinguish *Williams v. Eastside Mental Health Center,* 669 F.2d 671 (11th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982), in which this court reversed a district court decision deeming a community mental health center created pursuant to Alabama statute to be an instrumentality of the state.  In that case, we stated that if a state chooses to delegate certain functions to a separately incorporated non-profit institution, rather than perform the functions itself, "it must live with the consequences."  *Id.* at 678.[5]  In the case at bar, Florida exercises far greater control over PRIDE than Alabama did over Eastside, and so we consider that case to be inapposite.

IV.

Having concluded as a matter of law that PRIDE is an

---

[5]Although *Williams* was decided under the since-overruled *National League of Cities v. Usery* regime, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), nothing in *Usery* was essential to the court's statement.

instrumentality of the State of Florida, we now ascertain the impact of that status upon the applicability of the FLSA. More specifically, because PRIDE is operating, in a sense, as an arm of the Department of Corrections, pursuing a corrections function that traditionally has been the responsibility of state government, we examine cases from our sister circuits involving the applicability of the FLSA to prison industries which generate income for the prison.[6]

In recent years, at least three other courts of appeals have addressed situations very much like the case at bar: the Fourth Circuit in *Harker v. State Use Industries,* 990 F.2d 131 (4th Cir.), *cert. denied,* 510 U.S. 886, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993); the Eighth Circuit in *McMaster v. Minnesota,* 30 F.3d 976 (8th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1116, 130 L.Ed.2d 1080 (1995); and the Ninth Circuit in *Hale v. Arizona,* 993 F.2d 1387 (9th Cir.), *cert. denied,* 510 U.S. 946, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993). In each case, state prison inmates sought to be paid federal minimum wage for their labor in state prison industries. Each of the three courts of appeals rejected the inmates' claims on the basis that they were not "employees" under the FLSA.

---

[6]There is no question that the FLSA does not apply to the more ordinary situation where a prisoner performs labor which does not generate income (e.g., janitorial services within the prison). "[N]o Court of Appeals has ever questioned the power of a correctional institution to compel inmates to perform services for the institution without paying the minimum wage. Prisoners may thus be ordered to cook, staff the library, perform janitorial services, work in the laundry, or carry out numerous other tasks that serve various institutional missions of the prison...." *Danneskjold v. Hausrath,* 82 F.3d 37, 43 (2d Cir.1996).

Each court looked to the dual purposes of the FLSA—the provision of a decent standard of living for all workers and the avoidance of unfair competition, *Harker,* 990 F.2d at 133, 134; *McMaster,* 30 F.3d at 980; *Hale,* 993 F.2d at 1396—and concluded that neither was implicated. Each court noted that the state provides prisoners with food, shelter, and clothing, so that their standard of living is not at issue in this sort of case. *Harker,* 990 F.2d at 133; *McMaster,* 30 F.3d at 980; *Hale,* 993 F.2d at 1396. And each court noted that Congress has addressed the issue of unfair competition more specifically in the Ashurst-Sumners Act, 18 U.S.C. §§ 1761-62, which criminalizes the transportation in interstate commerce of prison-made goods in instances where prisoner labor threatens fair competition.[7] *Harker,* 990 F.2d at 134; *McMaster,* 30 F.3d at 980; *Hale,* 993 F.2d at 1397. Moreover, Ashurst-Sumners exempts prison-made goods manufactured for use by federal, state and local governments. 18 U.S.C. § 1761(b). We are persuaded by the reasoning of our sister circuits, and we join them in the conclusion that inmates who work for state prison industries are not covered by the FLSA.

Like Judge Wilkinson in *Harker, supra,* we too are concerned with the dramatic effects that a contrary decision would have on public policy, specifically at a time when federal and state prisons are struggling with the mounting costs of maintaining

---

[7]Congress enacted Ashurst-Sumners in 1935 and the FLSA in 1938. Congress has never replaced Ashurst-Sumners but has periodically amended and recodified it. See *Harker,* 990 F.2d at 134. The two statutes must be read in *pari materia,* "and it is axiomatic that, in this situation, the more specific statute must control." *Id.*

prisoners and with their burgeoning numbers. FLSA coverage for prisoners may also open the door to worker's compensation, overtime, and vacation pay. *See* Alexander B. Wellen, Comment, *Prisoners and the FLSA: Can the American Taxpayer Afford Extending Prison Inmates the Federal Minimum Wage?,* 67 Temp.L.Rev. 295, 296 (1994). Compelling states to pay the minimum wage to every inmate engaged in a PRIDE-type program could escalate costs enormously and could well compel correctional systems to curtail or terminate their highly-desirable programs. If FLSA coverage is to extend inside prison walls, this is a decision for Congress and not the courts. See *Harker,* 990 F.2d at 136.

V.

Accordingly, we hold that inmates of state prisons who work for industries operated as state instrumentalities are not covered by the Fair Labor Standards Act and are not entitled to receive federal minimum wage for their labor. Therefore, the judgment of the district court in favor of appellees is AFFIRMED.