**James Lee ANTHONY, Plaintiff,**

v.

**Charles L. BURKHART, Stewart Kirk, Mike Runner, Defendants.**

**No. 95–861–Civ.–T–17E.**

United States District Court,
M.D. Florida,
Tampa Division.

Sept. 30, 1998.

James Lee Anthony, Jr., Bowling Green, FL, pro se.

Charlann Jackson–Sanders, Henry A. Gill, Jr., Attorney General's Office, Dept. of Legal Affairs, Tampa, FL, for Charles L. Burkhart, Stewart Kirk, Mike Runner, defendants.

### ORDER

KOVACHEVICH, Chief Judge.

*Pro se* prisoner Plaintiff filed a civil rights complaint pursuant to 42 U.S.C. § 1983 on June 6, 1995. Plaintiff names as Defendants three employees of the PRIDE [1] Furniture Factory at Avon Park Correctional Institution. Plaintiff was incarcerated at Avon Park Correctional Institution at the time the alleged events of which he complains occurred.

Plaintiff complains that "Defendants violated my civil rights by conspiring to dismiss me solely because of race, and my utilizing the PRIDE grievance procedure in violation of 42 U.S.C. Sections 1981 & 1983." (Complaint, p. 7)

In support of his claim, Plaintiff alleges the following facts:

On or about March 8, 1995 I initiated a complaint against Charles L. BURKHART, about not having Black inmate workers in the main office of PRIDE Furniture Factory, who qualified for such position. Following PRIDE's personal policy letter for inmate programs, Policy Number 806.1 effective September 23, 1991, I filed my complaint to my immediate supervisor Clifford Godfrey. He could not settle the complaint.

I was then interviewed by Charles L. BURKHART, who advised me to make a list of all those who qualified for an office position who was Black. On or about March 17, 1995 a complete list of qualified Black inmates was hand delivered by me to Mr. BURKHART who took the list and said he would get back to me. On or about March 27, 1995 I was promoted from the saw division of PRIDE and placed into an office in the R.T.A. Division of PRIDE as a hardware clerk. I spoke with my new supervisor, Stewart Kirk and advised him

that my status did not change the initial complaint because no qualified Black worker was in the main office of PRIDE. On or about April 3, 1995 the Plaintiff received his response back from Stewart Kirk who advised that several Black workers held clerical positions but he failed to address the initial complaint of having no Blacks working in the main office of PRIDE.

The Plaintiff was then accused of using the company's printer for his own personal use. The Plaintiff explained to Mr. Runner that his supervisor gave him permission to use the printer when needed. Mr. Runner advised the Plaintiff that the policy had changed and no inmates were allowed to use the printer for personal use. The Plaintiff explained that he never was told about the change, no memo reflected this change and no meeting to cover the subject. The Plaintiff was then told that his supervisor will have to deal with him once he got back. On or about April 14, 1995 the Plaintiff was fired by Stewart Kirk for his alleged use of PRIDE's printer. On or about May 1, 1995 the Plaintiff filed a complaint about the racial motives behind his dismissal.

On or about May 9, 1995 Charles BURKHART responded to the Plaintiff's complaint and again asked the Plaintiff to provide information to him that he has access to himself. Mr. BURKHART also violated company policy by not sending the Plaintiff a copy of the attached portion of his complaint violating Rule 806.1. On May 16, 1995 Plaintiff filed to the office of the vice president Pamela Jo Davis who has also violated company policy 806.1 for her failure to respond to the complaint of the Plaintiff. The Defendants have conspired to violate my civil rights within the meaning of 42 U.S.C. Section 2000e–5(B) and Title VII.

The Plaintiff did file a complaint with the Equal Employment Opportunity Agency (EEOC) who responded Plaintiff wasn't an employee of PRIDE of Florida. The

---

1. Chapter 946 of the Florida Statutes mandates that a private, non-profit corporation be established, independent of the state, to operate the correctional work program for the State Department of Corrections.

Plaintiff was an employee of PRIDE of Florida.

(1) Charles L. BURKHART plant manager of PRIDE of Florida conspired with Supervisor Stewart Kirk, and Mike Runner to terminate the Plaintiff solely because he was Black and that he attempted to brake [sic] a cycle of no Black workers who qualify to work in the main office of PRIDE Furniture Factory.

(2) The termination of the Plaintiff was alleged due to Plaintiff's use of a company printer.

(3) The Plaintiff has knowledge that inmate workers have also been given approval by Stewart Kirk to use printer for personal use.

(4) Other inmate workers have also violated rules which did not result into their termination.

(5) The use of the copier was only a smoke screen for terminating the Plaintiff where similar situated inmate workers were not terminated.

(6) The promotion of the Plaintiff to the saw division to the R.T.A. division as a hardware clerk was to somehow curb the Plaintiff's quest to work in the main office. After this plan failed the Plaintiff was stalk [sic] and subsequently fired.

(7) The policy 806.1 is not effective when the company employers fails to obey their own protocol.

(8) Charles L. BURKHART, Stewart Kirk and Mike Runner all conspired together to have Plaintiff terminated solely because he was a Black worker attempting to get an office position to which he was initially hired to do. The Plaintiff was hired on or about September 22, 1994 to work in the main office. Upon arrival Plaintiff was told all office jobs was filled. The Plaintiff took a job to wait on an opening. Once openings occurred the workers was replaced with another white worker. Several openings came and went. Each time Plaintiff was overlooked. The Plaintiff then initiated this complaint of racial discrimination. This prompted conspiracy against the Plaintiff.

(9) The Plaintiff has suffered depression, and mental anguish as a result of his termination.

As relief, Plaintiff seeks:

(1) The Plaintiff seeks $25,000 Twenty-five thousand dollars from each named Defendant.

(2) The return to his current status before his termination including the same rate of pay.

(3) Plaintiff seeks attorney fees for Court costs.

(Complaint, pp. 8–11. Some editing for readability.)

It appears that Plaintiff's claim for the return to his current status is moot. According to Plaintiff, he is serving a life sentence and PRIDE has changed its policy to exclude all "lifer's" from its work force. (See Doc. No. 46, p. 2)

On October 10, 1995, Defendants filed a motion to dismiss (Doc. No. 13), which the Court denied on October 31, 1995. On September 4, 1996, Defendants filed their answer. Subsequently, the Court set dates for discovery and for filing dispositive motions. (Doc. No. 29)

On February 5, 1997, Defendants filed a motion for summary judgment, Plaintiff responded to the motion; thereafter, the Court instructed Plaintiff in the requirements of Rule 56, Federal Rules of Civil Procedures and Plaintiff filed a supplemental response to the motion for summary judgment. (See Doc. Nos. 33, 37, 41)

In their motion for summary judgment, Defendants claim that: (1) Plaintiff is not an "employee" of Defendants and has no standing pursuant to 42 U.S.C. Section 1981; (2) Defendants have not discriminated against Plaintiff, and that, to whatever extent he claims it is discrimination, "it does not satisfy the intent requirements pursuant to 42 U.S.C. section 1981;" (3) Defendant Stewart Kirk terminated Plaintiff for just cause; and, (4) Defendants are entitled to qualified immunity and therefore, are not liable for damages under section 1983.

Defendants further claim that:

Plaintiff was terminated for an act he committed, according to the allegations in his own complaint. He engaged in unauthorized use of the office copy machine. When approached about this by Defendant Runner, Plaintiff insisted that he had been given permission by his immediate supervisor, Defendant Kirk. While Defendant Runner proposed to immediately terminate Plaintiff, he agreed to postpone or change his decision, and wait to verify the truth of Plaintiff's story with Defendant Kirk, who at the time of the offense was not present in the factory. Upon his return, Defendant Kirk informed Defendant Runner that he had given Plaintiff no such permission. It was then that Plaintiff was terminated.

This factual scenario hardly reveals any intent to discriminate on the basis of race, even if Plaintiff had grievances pending about same. The reason for this rationale is that discipline, of all degrees, is no stranger to a prison setting. Infractions must be dealt with in a swift, stringent manner in any inmate work setting, due to ongoing security concerns of the facility. Staff who work with inmates are trained to realize, and know that a breach of security can be instituted by any inmate, regardless of his particular race. Rules of the Furniture Factory, and indeed of every single area of the Institution, are implemented and carried out not on the basis of race, but on the safety and efficiency considerations of the Institution. Another reason that it is a certainty that the Defendants did not intentionally discriminate against Plaintiff in terminating him, and nor was it in retaliation, is because correctional officials are not charged with any responsibility whatsoever, to racially diversify inmate work programs. There is simply no plausible way to balance the interests of incarceration and penalogical necessity, with racial diversity in an inmate work setting. Classifications officials place inmates in respective jobs based on upon a number of issues, paramount of which is the efficiency and safe-running of the Institution. Such decisions are inherently discretionary, as would be any decision to terminate an inmate from a particular program. The primary purpose of imprisonment of convicted felons is incarceration. Defendants simply would not need to retaliate against Plaintiff concerning an issue of which they were under no duty to maintain or correct. Plaintiff simply cannot come forward with a showing that any of the Defendants' actions constituted intentional discrimination.

However, Defendants did not file any affidavits, depositions, or other documents to support their motion for summary judgment.

Plaintiff contends that he has met the elements for a discrimination claim because other inmates also used the printer/copier [2] for personal use with the knowledge of PRIDE supervisors and these inmates were not terminated. He contends that termination for "the use of company equipment is a mere pretext for discrimination."

Since Defendants filed their motion for summary judgment, the United States Court of Appeals for the Eleventh Circuit decided *Gambetta v. Prison Rehabilitative Industries and Diversified Enterprises, Inc.,* 112 F.3d 1119 (11th Cir.1997). The *Gambetta,* Court ruled that PRIDE is a state instrumentality. 112 F.3d at 1123.

On July 8, 1998, the Court ordered Defendants to file a supplemental brief in which they discussed the applicability of *Gambetta* to the present case and allowed Plaintiff to file a reply to the supplemental brief. On July 20, 1997, Defendants filed their supplemental brief and, on August 4, 1997, Plaintiff filed his reply.

On July 10, 1998, the Court granted Defendants' motion for summary judgment as to Plaintiff's Title VII and 42 U.S.C. § 1981 claims. The Court also granted Defendants' motion for summary judgment as to claims for monetary damages against Defendants in their official capacities.

In addition, the Court ordered Defendants to file affidavits in support of their motion for

**2.** Plaintiff also refers to the machine as the "copier."

summary judgment. Defendants Burkhart and Runner have complied with that order.[3]

## QUALIFIED IMMUNITY

I. Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." The qualified immunity doctrine means that government agents are not always required to err on the side of caution.

II. That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities. Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

III. For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing" violates federal law. Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases.

The most common error we encounter, as a reviewing court, occurs on this point: courts must not permit plaintiffs to discharge their burden[4] by referring to general rules and to the violation of abstract "rights."

"General propositions have little to do with the concept of qualified immunity." "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances." And, as the en banc court recently accepted:

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The ·facts need not be the same as the facts of the immediate case. But they do need to be materially similar. Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.

IV. Because qualified immunity is a doctrine of practical application to real-life situations, courts judge the acts of defendant government officials against the law and facts at the time defendants acted, not by hindsight, based on later events.

V. The subjective intent of government actor defendants plays no part in qualified immunity analysis.

VI. A decision on qualified immunity is separate and distinct from the merits of the case—a principle illustrated by the Supreme Court's willingness to treat the denial of qualified immunity at summary judgment as an appealable collateral order.

*Lassiter v. Alabama A & M University, Board of Trustees,* 28 F.3d 1146, 1149–51 (11th Cir.1994) (citations omitted). *See, Kel-*

---

**3.** Counsel for Defendants states that Defendant Stewart Kirk is no longer employed by PRIDE. (See Doc. No. 49)

**4.** Once the qualified immunity defense is raised, Plaintiffs bear the burden of showing that the federal "rights" allegedly violated were "clearly established." *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989)(citing *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

ly v. Curtis, 21 F.3d 1544, 1550 (11th Cir. 1994).

## STANDARD FOR SUMMARY JUDGMENT

The Eleventh Circuit recently discussed the standard for granting summary judgment:

> Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (1993), reh'g and reh'g en banc denied, 16 F.3d 1233 (11th Cir.1994).

The Eleventh Circuit recognized the seminal case concerning summary judgment, Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) by highlighting the following passage:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Hairston, 9 F.3d at 918.

Finally, the parties' respective burdens and the Court's responsibilities are outlined:

> The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. Taylor v. Espy, 816 F.Supp. 1553, 1556 (N.D.Ga.

1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir.1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. Matsushita Electric Industrial Co. v. Zenith Radio Corp.[,] 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991).

> Applicable substantive law will identify those facts that are material. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. Id. For factual issues to be considered genuine, they must have a real basis in the record. Matsushita, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. Anderson, 477 U.S. at 249, 106 S.Ct. at 2510. The Court must avoid weighing conflicting evidence or making credibility determinations. Id. at 255, 106 S.Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

Id. at 918–19. See Mulhall v. Advance Sec. Inc., 19 F.3d 586, 589–90 (11th Cir.), cert. denied, 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994). Because there are no genuine issues of material fact, Defendant's

motion for summary judgment on Plaintiff's remaining claims will be granted.

## DISCUSSION

### PLAINTIFF'S 42 U.S.C. SECTION 1983 CLAIMS

 Clearly, prison officials cannot discriminate against Plaintiff on the basis of his age, race, or handicap in choosing whether to assign him a job or in choosing what job to assign him. *Williams v. Meese,* 926 F.2d 994, 998 (10th Cir.1991); *Bentley v. Beck,* 625 F.2d 70, 70–71 (5th Cir.1980). Furthermore, prison officials cannot punish Plaintiff for exercising his First Amendment rights by denying him certain job assignments or transferring him from one job to another. *Williams,* 926 F.2d at 998.

### *Claims Against Defendants Burkhart and Runner*

 In the present case, Defendants Burkhart and Runner are entitled to qualified immunity summary judgment because their actions were not "so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing..." *Lassiter,* 28 F.3d at 1149.

Defendant Burkhart states, in his affidavit:

1. My names is Charles Burkhart. I am employed as General Manager of PRIDE. I am familiar with the facts of this lawsuit generally ...

2. I am currently listed to be a witness in the trial for the above referenced case.

3. I am an employee of PRIDE and I do not work for the Department of Corrections ("DOC").

4. I do not select which inmates are chosen and/or sent to PRIDE. DOC selects which inmates are sent to PRIDE, based on DOCS's discretion.

5. I have no vested interest in insuring an "all white" work force, in any area of PRIDE. I am a paid employee, and have no ownership interest in PRIDE.

6. All of Mr. Anthony's grievances were responded to. I have no reason to retaliate against Mr. Anthony for complaining.

7. Mr. Anthony was advised in his office practice class, that his qualifications were not the sole determinant of where he was assigned to work in the PRIDE Furniture Factory.

8. Mr. Anthony was not fired because he is black, and there was not a conspiracy to fire him.

Defendant Runner states, in his affidavit:

1. My names is Mike Runner. I am employed as a Supervisor of PRIDE. I am familiar with the facts of this lawsuit generally ...

2. I am currently listed to be a witness in the trial for the above referenced case.

3. I am an employee of PRIDE and I do not work for the Department of Corrections ("DOC").

4. I do not select which inmates are chosen and/or sent to PRIDE. DOC selects which inmates are sent to PRIDE, based on DOCS's discretion.

5. I have no vested interest in insuring an "all white" work force, in any area of PRIDE. I am a paid employee, and have no ownership interest in PRIDE.

6. All of Mr. Anthony's grievances were responded to. I have no reason to retaliate against Mr. Anthony for complaining.

7. Mr. Anthony was advised in his office practice class, that his qualifications were not the sole determinant of where he was assigned to work in the PRIDE Furniture Factory.

8. Mr. Anthony was not fired because he is black, and there was not a conspiracy to fire him.

William R. Noble, Vice–President of Human Resources of PRIDE, also filed an affidavit in which he stated "that PRIDE's purpose, with regard to inmates, is the training of the inmates selected for PRIDE. The inmates who are assigned to PRIDE are not 'employees,' as would be traditional in a setting not involving incarceration." (See Affidavits attached to Document Number 49.)

Plaintiff has not shown that Defendants Burkhart and Runner's actions were not objectively legally reasonable under the circumstances of this case. *Lassiter,* 28 F.3d at

1150. Defendants have no control over which inmates the Classification officer of the Department of Corrections assigns to the Furniture Factory. Defendants cannot create an "all-white" work atmosphere, and do not have a duty to racially diversify the workforce of the Furniture Factory, or any inmate labor program.

### Discrimination Claims

Plaintiff has not alleged sufficient facts to support his claim that Defendants discriminated against him in not assigning him to the front office. Plaintiff's conclusory claim that "I was chosen by Charles L. Burkhart to fill a position in PRIDE's main office at the furniture factory Avon Park Division" (See February 7, 1997 affidavit attached to Document Number 39) is not supported by Plaintiff's own allegations or by anything else in the record. In his response to the motion for summary judgment, Plaintiff recited the following relevant facts:

> The Plaintiff is an African American male prisoner, who was highly recommended for an office position at Pride of Florida Furniture Factory, at Avon Park, Florida. This was done by his vocational instructor, Mrs. Mary Jean Adams. Mrs. Adams received a phone call from Mr. Charles L. Burkhart inquiring about qualified inmates to work in the main office at the furniture factory. The Plaintiff was chosen.

> Upon arriving at PRIDE, the Plaintiff was interviewed by Charles L. Burkhart, and informed to the Plaintiff's disappointment that no vacancies were open in the main office, but that the next opening would go to the Plaintiff.

(Doc. No. 39, p. 1)

Nowhere does Plaintiff state that *Mr. Burkhart* chose him to fill a position in the main office.[5] In fact, Plaintiff does not even state that a position was open at the time Mrs. Adams received the telephone call. He

states that "Mrs. Adams received a phone call from Mr. Charles L. Burkhart inquiring about qualified inmates to work in the main office at the furniture factory. The Plaintiff was chosen [by Mrs. Adams for an interview]."

Furthermore, as Defendant Burkhart states in his affidavit, Plaintiff was told that his qualifications were not the sole determinant of where he was assigned to work in the PRIDE Furniture Factory.

Plaintiff claims that Defendant Burkhart "promised" him the next job in the main office, and that when the opening was available, he was overlooked. Plaintiff does not state the date of which the opening occurred, or whether the qualifications and requirements had changed during the time period when he was interviewed and when the opening occurred. Plaintiff also claims that subsequent to his interview, white inmates were hired to work in the office, while he received promotions in other areas. However, Plaintiff has not shown that the office workers were hired based solely on the fact that they were white, or that he was not chosen based solely on the fact that he was Black. Nor has he shown that the required qualifications had changed so that he did not meet the qualifications. Inmate Gaines' statement, in his affidavit, that there were no Black inmates working in the main office in 1994 does not create a genuine issue of material fact in this case. Finally, nothing in the record supports a claim that Defendant Burkhart was required to hire Plaintiff because he was recommended by Mrs. Adams.

Furthermore, Plaintiff has not shown that Congress nor the Florida Legislature intended or legislated that the state prisons implement or work toward a goal of affirmative action in its inmate work programs.[6] Nor is there any requirement that race be consid-

---

**5.** Plaintiff has not provided any support for his conclusory statement that "Plaintiff was hired on or about September 22, 1994 to work in the main office."

**6.** Plaintiff's grievance of March 7, 1995, indicates that Plaintiff sought some type of affirmative action. The grievance read as follows:

RESOLUTION REQUESTED BY INMATE WORKER: That there be an equal number of black inmate workers placed into the office whose qualify to do the work as their white counterparts. At the present moment there are no black workers at any office level position. And many black inmates do qualify.

ered as a factor in the assignment or removal of an inmate from the work program.

### Unauthorized Use of Copier

Defendants claim that Plaintiff was terminated for unauthorized use of the PRIDE copier. Plaintiff has not alleged facts to overcome that claim. Although Plaintiff filed affidavits to show that at one time inmates were allowed to use PRIDE copiers, the affidavits do not show that the policy had not changed at the time Plaintiff's unauthorized use occurred. Mike Davis' affidavit is not dated and Davis does state when the alleged incidents described in his affidavit occurred. Freddie Gaines states, in his affidavit, that he worked at PRIDE in December, 1994, and that inmates were allowed to use the office copier *at this time*, in 1994. These affidavits do not create a genuine issue of material fact because Plaintiff's termination occurred on April 14, 1995. Clearly, the policy of inmate copier use could have changed after Davis and Gaines worked at PRIDE and before Plaintiff's termination. (See Affidavits attached to Document Number 39)

### Retaliation

Plaintiff makes a conclusory allegation that he was terminated from his employment at PRIDE because he filed a complaint to the U.S. Equal Employment Opportunity Commission in April, 1995. However, nothing in the record supports this allegation. According to Plaintiff, he did not prevail on the claim.

### *Claims Against Defendant Kirk*

Defendant Kirk did not file an affidavit in support of his motion for summary judgment. However, because no genuine issues of material fact remain, he is entitled to summary judgment. In *Frow v. De La Vega*, 15 Wall (82 U.S.) 552, 554, 21 L.Ed. 60 (1872), the Court stated:

> [I]f the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others. If it be decided in the complainant's favor, he will then be entitled to a final decree against all.

Because Plaintiff Anthony claims that Defendants *conspired* to violate his constitutional rights, Plaintiff is, in essence, claiming that Defendants were jointly liable. Defendant Kirk's situation is analogous to the defaulting Defendant's situation in *Frow*. In the present case, the Court will grant Defendant Burkhart's and Runner's motion for summary judgment. Pursuant to *Frow*, Defendant Kirk is also entitled to summary judgment.

Some courts have questioned the continued force of *Frow* after the adoption of Rule 54, Federal Rules of Civil Procedure. However, even these courts conclude that *Frow* controls "in situations where the liability of one defendant necessarily depends upon the liability of the others." *Days Inns Acquisition Corporation v. Hutchinson*, 707 So.2d 747, 749 (Fla.App. 4th Dist.1997)(quoting *International Controls Corp. v. Vesco*, 535 F.2d 742, 746 n. 4 (2d Cir.1976)).

Accordingly, the Court orders:

1. That Defendants' motion for leave to file affidavits out of time (Doc. No. 49) is granted.

2. That Plaintiff's claim for injunctive relief—"The return to his current status before this termination including the same rate of pay" is denied.

3. That Plaintiff's claim for attorney fees and court costs is denied.

4. That Defendants' motion for summary judgment (Doc. No. 37) is granted. The Clerk is directed to enter judgment against Plaintiff and to close this case.